(No. 64287

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LARRY SCOTT, Appellant.

*Opinion filed April 16, 1992.—Rehearing denied June 25, 1992.*

Randolph N. Stone, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Sally Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

On August 17, 1984, defendant, Larry Scott, was indicted for murder, aggravated criminal sexual assault and attempted robbery in relation to the death of Kristin Kent, the victim. Following a jury trial in the circuit court of Cook County, defendant was found guilty of murder, guilty of attempted robbery, and guilty but mentally ill (GBMI) of aggravated criminal sexual assault. The State moved for a separate sentencing hearing on imposition of the death penalty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d).) Defendant waived his right to a jury for the sentencing hearing. The trial court found defendant was eligible for the death sentence because he was more than 18 years old at the time of the offense, and he committed murder in the course of committing a forcible felony, aggravated criminal sexual assault. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b); see also *People v. Crews* (1988), 122 Ill. 2d 266 (holding that a defendant may be sentenced to death even though he has been found guilty but mentally ill).) After finding there were no mitigating factors sufficient to preclude imposition of the death

penalty, the court sentenced defendant to death. The sentence was stayed pending direct appeal to this court. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(i).) In addition, defendant was sentenced to serve 30 years in the Illinois Department of Corrections for the offense of aggravated criminal sexual assault. No sentence was imposed for the offense of attempted robbery.

While the case was pending review in this court, defendant was granted leave to file a post-sentencing motion (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401 *et seq.*) in the trial court. In addition to a post-sentencing motion, defendant also filed a supplemental motion for a new trial. On the State's motion, this court instructed the trial court to consider defendant's post-sentencing motion only. Defendant then amended his post-sentencing motion to include allegations of trial error, arguing that the trial errors impacted on the sentencing hearing. Based on the prior order from this court, the trial court refused to consider those allegations. After a hearing the trial court denied defendant's post-sentencing motion.

I

The victim was a resident student at the Moody Bible Institute located in the 800 block of North La Salle Street in Chicago. At approximately 9 p.m. on August 4, 1984, she left her job at the East Bank Health Club. On August 6, 1984, her body was found in an alley behind a building located at 711 North Wells Street. One of her nipples had been severed.

On August 6, Sarah Buschbaum read a newspaper report about the victim's murder and called police to inform them that on the night of August 4, she had been followed by a man in the same neighborhood in which the victim's body had been found. On that night, Buschbaum left her job in Water Tower Place at approximately 8:35 p.m. and proceeded west on Chestnut Street to-

wards her car, which was parked on La Salle Street. While she was walking, she noticed that a man was following her. Buschbaum took several evasive steps, but the man continued to follow her. By the time she reached Clark Street, there were no other people on the street. Buschbaum then ran into the lobby of an apartment building which she knew was attended by a doorman. The assailant continued to watch Buschbaum from across the street as he walked towards La Salle Street. Buschbaum waited a few minutes and then proceeded to her car. Before she reached her car, she noticed the man walking west on Chicago Avenue from La Salle towards Wells. Buschbaum described the assailant as a black man in his late twenties, 5 feet 6 inches to 5 feet 8 inches in height with a medium build, and wearing a gold plaid suit with a herringbone background.

In the early evening of August 7, 1984, police officers Charles Daly and Michael Angarone were on routine patrol in the 600 block of North Wells. At this time, they saw a woman walking north on Wells and a man following quickly behind her. The man, who was later identified as defendant, matched the description provided by Buschbaum. Defendant saw the police officers and slowed his pace to allow a greater distance between himself and the woman. The police passed defendant, made a U-turn and approached defendant from behind. At this time, the officers noticed defendant was walking up quickly behind the woman. Defendant noticed the police and again slowed his pace. The police passed defendant, went around the block and approached defendant a third time. Defendant was again walking quickly behind the woman, until he saw the police. This time defendant turned to walk south on Wells in the opposite direction of the woman. The police made another U-turn, and as they approached defendant, he turned and walked towards an "El" station.

Daly and Angarone got out of their squad car and ordered defendant to stop. The officers asked defendant for identification, at which point defendant gave them several papers. As Angarone began to unwrap the papers, defendant pushed Angarone and yelled "I'm going to kill you." Daly and Angarone subdued defendant and placed him in handcuffs. Angarone then picked up the papers, which he had dropped during the struggle with defendant. At this time, Angarone noticed a newspaper article about the victim's murder. As Angarone unfolded the article, defendant screamed "That pussy bitch. That pussy bitch. I'm tired of hearing about her."

Angarone and Daly arrested defendant for disorderly conduct and transported him to the 18th district Chicago police station. While en route to the 18th district, the officers advised defendant of his *Miranda* rights.

At approximately 9:30 p.m. on August 7, Detectives O'Leary and Elmore transported defendant from District 18 to the Area 6 Violent Crimes offices. The detectives placed defendant in an office, uncuffed him and left him alone in the room for about one hour. When they returned at about 11 p.m., O'Leary read the *Miranda* warnings to defendant. Defendant responded that he understood each right. The detectives then questioned defendant for approximately 45 minutes.

At approximately 2 a.m. on August 8, Detectives Sappanos and Paul interviewed defendant at Area 6. Sappanos read the *Miranda* warnings to defendant from a police manual. Defendant responded that he understood each right. This interview lasted 45 minutes to one hour. During the interview, defendant's answers were succinct and understandable.

Between 3 a.m. and 8 a.m., Sappanos checked on defendant and found that he was asleep in the interview room. At 8 a.m., Sappanos woke defendant, allowed him to use the bathroom and provided him with food. Sap-

panos then readvised defendant of his *Miranda* rights, and defendant responded that he understood each right. This interview lasted approximately 45 minutes.

At about 10:45 a.m. Detectives Sappanos and Paul interviewed defendant again. They readvised defendant of his *Miranda* rights and defendant indicated he understood each right. At the detectives request, defendant agreed to ride with the officers to the 700 block of North Wells and to the Oak Street Beach where he slept on the night of the murder. On the way back to the police station, the officers stopped at a McDonald's restaurant and ordered food for defendant.

Detective Sappanos was present when Assistant State's Attorney Edward Snow interviewed defendant at 2 p.m. on August 8, 1984, in the interview room at Area 6. Snow advised defendant of his *Miranda* rights and defendant responded that he understood. After a 45-minute interview, defendant agreed to make a statement. Snow then summoned a court reporter who transcribed defendant's answers to Snow's questions.

During his statement to Snow, defendant stated that the police did not mistreat him, and that he understood his *Miranda* rights. Defendant stated that he initially approached the victim for money, and took her into an alley. Defendant stated the victim called him "a little black nigger" and began to struggle. Defendant hit the victim several times, knocking her unconscious. While the victim was unconscious, defendant had vaginal and oral sex with her, during which time he bit her nipples and vagina. After having sex with the victim, defendant hid her body. During this time, the victim did not move or say anything, but defendant stated that she appeared to be breathing.

## II

Defendant first contends that the trial court should

have granted his pretrial motion to quash arrest. Officer Daly was the only witness called to testify at the hearing on the motion to quash. During his argument at the close of evidence, defendant conceded that the initial stop could be justified by less than probable cause. In effect, this argument conceded that defendant was not arrested at the time of the initial stop. In denying defendant's motion to quash arrest, the trial judge stated, "I think that the officer has set forth articulable facts to justify the police stopping [defendant]. And then of course the matters that proceeded after he stopped him certainly justify him being placed under arrest."

Defendant now maintains that he was arrested at the time the police stopped him and asked for identification. Defendant argues that because the officers did not have probable cause to believe defendant had committed an offense, this arrest violated his fourth amendment rights against unreasonable search and seizure. However, as noted above, defendant conceded in the trial court that the initial stop was not an arrest. Therefore, we will only consider whether the officer's actions met the lower standard necessary to justify an investigatory stop.

In *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." (*Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.) In a later case, the Court stated "[a] brief stop of a suspicious individual, in order to determine his identity *** may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams* (1972), 407 U.S. 143, 146, 32 L. Ed. 2d 612, 617, 92 S. Ct. 1921, 1923.

In Illinois, the *Terry* exception to the probable cause requirement has been codified in section 107—14 of the Code of Criminal Procedure of 1963, which provides in pertinent part:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions." Ill. Rev. Stat. 1983, ch. 38, par. 107—14.

In order to justify an investigative stop, the police must identify "specific articulable facts which, when taken together with natural inferences, make the intrusion reasonable." (*People v. Smithers* (1980), 83 Ill. 2d 430, 436, citing *People v. McGowan* (1977), 69 Ill. 2d 73, 78.) These facts "need not meet probable cause requirements, but they must justify more than a mere hunch." (*People v. Long* (1983), 99 Ill. 2d 219, 228.) When considering whether an officer was justified in making an investigatory stop, "the facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him." *Long*, 99 Ill. 2d at 229.

In the present case, the police were aware that at approximately the same time the murder was committed, a man matching defendant's description had followed Buschbaum in the general vicinity of the murder. Three days after the murder, two officers saw defendant following another woman within two blocks of the murder scene. Before stopping defendant and requesting his identification, the officers observed defendant as he alternately walked up quickly behind the woman and slowed to allow distance between himself and the

woman, depending on whether he noticed the police nearby. We believe these articulable facts and the natural inferences which may be drawn from them justified the police stopping defendant for questioning. Further, in light of defendant's actions after he was stopped, the police were justified in arresting him for disorderly conduct. Therefore the trial court's ruling was not against the manifest weight of the evidence.

### III

Defendant next argues that his conviction must be reversed because he was not fit to stand trial. Specifically, defendant argues that the trial court erred in ruling defendant was fit for trial after finding that he suffered from a mental disease or defect and that he was unable to cooperate with his own counsel. (See Ill. Rev. Stat. 1983, ch. 38, par. 104—10.) Defendant argues that these findings by the trial court are the statutory requirements for a finding of unfitness and, therefore, the trial court should have found defendant was unfit to stand trial. In addition, defendant argues the court improperly relied on hearsay evidence for its conclusion that defendant was able but unwilling to cooperate with counsel.

After he was indicted, defendant submitted to numerous court-ordered examinations by psychiatrists and clinical psychologists regarding his fitness to stand trial. (Ill. Rev. Stat. 1983, ch. 38, par. 104—10.) These examinations resulted in conflicting opinions regarding the defendant's mental condition and his ability to cooperate with his trial counsel. Based on the opinion of Dr. Robert Reifman of the Psychiatric Institute, defendant filed a motion for a fitness hearing on April 30, 1985. However, on August 20, 1985, this motion was withdrawn after Dr. Reifman changed his diagnosis based upon an examination of defendant conducted on August 16, 1985. Defendant renewed this motion on September 3, 1985,

after Dr. Reifman again found defendant unfit to stand trial based upon an examination conducted on August 28, 1985.

On September 9, 1985, the trial court conducted a fitness hearing. Although the State had the burden of proving defendant was fit (Ill. Rev. Stat. 1985, ch. 38, par. 104—11(c)), for purposes of convenience the fitness hearing began with the testimony of defense witness Dr. Reifman. Dr. Reifman testified that he is a psychiatrist and the director of the Psychiatric Institute of the circuit court of Cook County. Dr. Reifman stated that he examined defendant on five separate occasions regarding his fitness to stand trial. In addition, Reifman reviewed records of the Department of Mental Health relating to defendant's prior hospitalizations. Dr. Reifman also reviewed reports prepared by Dr. Stipes, Dr. Blumstein, Dr. Cavanaugh, Dr. Garvin and Dr. Rabin. In Dr. Reifman's opinion, defendant was a paranoid schizophrenic who was "out of contact with reality." Dr. Reifman testified that defendant understood the charges against him, but that due to his mental illness, he was unable to cooperate with his counsel.

On cross-examination, Dr. Reifman conceded that Dr. Blumstein of the Psychiatric Institute had examined defendant on March 27, 1985. At that time, Dr. Blumstein found that defendant suffered only a personality disorder and that he was able to cooperate with his counsel. Four days later, Dr. Reifman examined defendant and found he was unfit. In addition, on August 28, 1985, Dr. Reifman found defendant unfit even though Dr. Blumstein had found defendant fit on August 16, 1985.

During cross-examination, Dr. Reifman also stated that on two previous occasions he had examined defendant and found him fit for trial. Dr. Reifman explained that because defendant's condition fluctuates he misdiag-

nosed defendant on those occasions that he found defendant was fit for trial.

The State called Dr. James Cavanaugh, a psychiatrist from the Isaac Ray Center. Dr. Cavanaugh stated that he examined defendant in May 1985, on June 3, 1985, and on September 9, 1985. Dr. Cavanaugh testified that defendant was oriented and cooperative during Dr. Cavanaugh's conversations with him. Dr. Cavanaugh testified that defendant had a personality disorder, but that he did not suffer from a mental disease or defect. Dr. Cavanaugh further testified that defendant could understand the charges against him and was capable of cooperating with his counsel. Dr. Cavanaugh based his opinion on his own examinations of defendant, the results of a competency screening test and a Minnesota Multi-Phasic Personality Inventory (MMPI) test. In addition, Dr. Cavanaugh relied on a report prepared in 1983 by Dr. Stipes of the Psychiatric Institute, who examined defendant to determine his fitness for trial on an unrelated offense. Dr. Stipes' report concluded that defendant was able to cooperate with counsel in 1983, but that defendant was unwilling to do so. Dr. Cavanaugh testified that based on his evaluation of defendant he agreed with Dr. Stipes' findings that defendant was capable of cooperating with his counsel, but that defendant may have chosen not to do so.

Dr. Orest Wasyliw, the senior clinical psychologist at the Isaac Ray Institute, testified for the State. Dr. Wasyliw examined defendant in June 1985 and administered the MMPI test. Based on the results of this test and his interview of defendant, Dr. Wasyliw found no evidence of any thought disorder which would affect defendant's ability to cooperate with his counsel.

Dr. Michael Rabin, a clinical psychologist, then testified for the defense. Dr. Rabin examined defendant on September 6, 1985, at which time Dr. Rabin conducted a

clinical interview and administered the MMPI, the Thematic Aperception Test and the Rorschach ink blot test. Based on his examination, defendant's hospital records and the reports of Dr. Wasyliw's examination, Dr. Rabin diagnosed defendant as having a schizo-affective disorder. Dr. Rabin testified that defendant has "paranoid compulsive problems as well and he uses those as defenses to mask his psychoses." Dr. Rabin concluded that defendant could understand the proceedings but that he was unable to cooperate with counsel.

At the conclusion of the fitness hearing, the trial judge made the following ruling:

> "I have listened to the evidence, it is conflicting but one thing is clear, Mr. Scott does suffer from a mental disease or a mental defect. The question that remains to be resolved is the cause of the mental disease or defect. He's unable to cooperate with his own counsel. The Court feels that there is no cooperation based upon this evidence it is thought that Mr. Scott does not wish to cooperate. Therefore he does not meet the legal requirement for unfitness on the basis of non-cooperation. The Court finds him fit."

Defendant now argues that the court improperly considered a nonstatutory factor when it found defendant fit. Specifically, defendant argues that the trial court should not have considered his willingness to cooperate with counsel because the court had already found defendant was unable to cooperate.

The State argues that the above ruling contained in the record is merely a typographical error, and that the trial court actually found defendant was "able to cooperate with his own counsel." In response to the State's argument, defendant filed in this court a motion to strike this argument from the State's brief, which motion was taken with the case. Attached to defendant's motion is an affidavit from the official court reporter who was

present for the fitness hearing. In the affidavit, the court reporter states that she reviewed her notes from September 9, 1985, and that her review of those notes shows the trial court's ruling is accurately recorded in the common law record. Based on this affidavit, we find that the common law record accurately reflects the trial court's comments at the fitness hearing, and thus we grant the motion.

Nonetheless, reading the trial court's ruling in its entirety, we believe the trial court found that defendant's lack of cooperation was due entirely to his unwillingness to cooperate rather than an inability to do so. Despite the court's obvious statement that defendant is "unable to cooperate with his own counsel," we believe the court found he was capable of such cooperation. In the very next sentence, the court states that there is no cooperation and that "based upon this evidence it is thought that Mr. Scott does not wish to cooperate." When read in context, the court's comments indicate that it found defendant was not cooperating with counsel, but that this lack of cooperation was due to his unwillingness rather than his inability to do so.

Defendant also claims that Dr. Stipes' 1983 report was improperly admitted as substantive evidence at the fitness hearing, and that the trial court relied exclusively on this hearsay evidence for its ruling that defendant was able but unwilling to cooperate. Both of these arguments are without merit. We note that defendant initially introduced Dr. Stipes' report during his direct examination of Dr. Reifman. Consequently, defendant may not now complain that this evidence should not have been admitted. Further, we note that Dr. Cavanaugh specifically testified that based on his own examination of defendant, as well as his review of Dr. Stipes' report, he believed defendant could cooperate with counsel if he chose to do so. Thus, Dr. Cavanaugh's testimony pro-

vided sufficient evidence upon which the trial court could support its finding.

## IV

Defendant next argues that post-arrest statements he made to various police officers and Assistant State's Attorney Snow should have been suppressed. Defendant argues that the statements were taken in violation of his rights under the fifth amendment and *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Specifically, defendant maintains that because he did not understand his *Miranda* rights he could not make a valid waiver of these rights and, therefore, the statements must be suppressed.

Under Federal law, a valid waiver of *Miranda* rights has two distinct elements. First, the decision to relinquish the right " 'must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*Colorado v. Spring* (1987), 479 U.S. 564, 573, 93 L. Ed. 2d 954, 965, 107 S. Ct. 851, 857, quoting *Moran v. Burbine* (1986), 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141.) In addition to these Federal voluntariness principles, a confession must also be voluntary in a State-law sense. *People v. Bernasco* (1990), 138 Ill. 2d 349, 365.

Whether a valid waiver has been made is a question of fact which must be determined by the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation. (*People v. Simmons* (1975), 60 Ill. 2d 173, 179.) Initially, the State has the burden of proving by a preponderance of the evidence that a defendant made a voluntary, knowing and

intelligent waiver of his fifth amendment rights. (*Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *Colorado v. Connelly* (1986), 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515.) However, "[o]nce the State has established its *prima facie* case, the burden shifts to defendant to show that his waiver was not knowing, intelligent or voluntary." *People v. Reid* (1990), 136 Ill. 2d 27, 51.

In this case, defendant does not argue that his statements were coerced by the police or that he was not informed of his *Miranda* rights. Rather, defendant maintains that due to the combination of his low IQ and his mental illness he was unable to understand the nature of his rights and the consequences of abandoning those rights. Therefore, defendant argues he was incapable of making a knowing and intelligent waiver of those rights under *Simmons*, 60 Ill. 2d 173.

In *Simmons*, this court stated:

> " 'The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition. * * *
>
> This court has long recognized that the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary (*People v. Klyczek*, 307 Ill. 150, 155) and while mental deficiency, of itself, does not render a confession involuntary (*People v. Hester*, 39 Ill. 2d 489) it is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession made. [Citations.]' " *Simmons*, 60 Ill. 2d at 180, quoting *People v. Turner* (1973), 56 Ill. 2d 201, 205-06.

At the hearing on the motion to suppress, the State called Detectives O'Leary, Elmore, Sappanos and Paul as

well as Assistant State's Attorney Snow. Each witness testified that he either personally administered *Miranda* warnings to defendant or was present when someone else administered the warnings. Each witness stated that defendant said he understood these rights and that defendant gave responsive answers to questions.

Dr. Leonard Koziol, a psychologist, testified that defendant could not understand the term "waive." Dr. Koziol examined defendant on December 30, 1985, to determine his ability to give a knowing and intelligent waiver of his constitutional rights. Dr. Koziol conducted a clinical interview of defendant and administered the Wechsler Adult Intelligence test. According to the Wechsler test, defendant has an IQ of 75, which places him in the bottom 5% of the population. In addition to the Wechsler test, Dr. Koziol administered the Neuropsychological Screening Battery, Rorschach ink blot test, Thematic Aperception Test and the Rotter Sentence Completion test. Dr. Koziol also reviewed the police reports of defendant's arrest, the transcript of the hearing on defendant's motion to quash arrest and defendant's statement to Assistant State's Attorney Snow. Dr. Koziol diagnosed defendant as suffering from schizophrenia, which in combination with his low IQ rendered him unable to make a knowing and intelligent waiver of his constitutional rights.

On rebuttal the State called Dr. Cavanaugh, who examined defendant on January 23, 1986, to determine whether defendant could make a knowing and intelligent waiver of his rights. In addition to the material Dr. Cavanaugh relied on for his fitness determination, he reviewed defendant's statement, police reports from the case and interviews with Detective Sappanos and Assistant State's Attorney Snow. Based on this information, Dr. Cavanaugh testified that defendant was capable of

making a knowing and intelligent waiver of his constitutional rights.

A trial court's decision on the issue of voluntariness of a confession "will not be disturbed on review unless found to be contrary to the manifest weight of the evidence." (*People v. Aldridge* (1980), 79 Ill. 2d 87, 93.) In this case, the trial court heard extensive evidence regarding defendant's mental condition and intelligence level. In addition, the court heard more such evidence at the fitness hearing. The court found that the evidence of defendant's mental state and erratic behavior, both during and after his arrest, did not vitiate the voluntariness of his confession. Based on the record before us, we cannot say this ruling is against the manifest weight of the evidence.

## V

Defendant next contends the court improperly sustained the State's objection to the form of a *voir dire* question proposed by defendant. Although *voir dire* was conducted by counsel, initially the trial court intended to conduct the *voir dire* itself. Consequently, defendant submitted a list of proposed questions to the court. The trial court sustained the State's objection to the question at issue which read, "Do you have any feelings or viewpoint concerning the defense of insanity in a criminal case? If so, what?" This question was specifically approved by this court in *People v. Stack* (1986), 112 Ill. 2d 301. Therefore, defendant argues the trial court abused its discretion by refusing to allow defendant to put this question to the venire.

In *Stack*, this court considered whether the trial court abused its discretion in refusing to ask this question on *voir dire*. Due to the controversial nature of the insanity defense, this court held that the question should have been put to the venire. (*Stack*, 112 Ill. 2d 301.) This

court analogized the proposed question with inquiries regarding prospective jurors' beliefs about imposition of the death penalty. This court stated:

> "[T]he jury was going to be asked to apply an extraordinarily controversial legal requirement against which many members of the community may have been prejudiced. Inquiry into the feeling or viewpoint of the venire regarding such controversial legal propositions is consistent with a *bona fide* examination conducted so that the parties can intelligently exercise their prerogatives to challenge." (*Stack*, 112 Ill. 2d at 312.)

This court further stated that in cases involving the insanity defense, a defendant's right to an impartial jury is not adequately protected by a *general question* regarding whether the prospective jurors would follow the court's instructions on the law. Rather, to fully protect a defendant's rights, some inquiry into the proposed juror's views on the insanity defense in particular is required.

Defendant now argues that because the trial court precluded him from asking the proposed question, he was deprived of the means with which to select an impartial jury. We disagree. The court in *Stack* did not state that all defendants who wish to present an insanity defense must be permitted to ask this precise question. Rather, the court held that the defendant must be allowed to "identify and challenge those prospective jurors who would refuse to follow the statutory law of the insanity defense" (*Stack*, 112 Ill. 2d at 313), through an examination of each venire member's attitudes toward that controversial defense. The exact phrasing of the *voir dire* question is not as important as the opportunity to obtain meaningful information regarding any preconceptions the venire members might have on the issue of the insanity defense.

Unlike *Stack*, in the present case the *voir dire* was not limited to general questions about whether the jurors would follow the court's instructions. Although the court disallowed the above-quoted question, the court did allow defendant to canvas the venire members' views regarding the insanity defense. For example, defendant was allowed to ask the following questions during *voir dire*:

"[K]nowing the serious nature of the charges do you think the fact that you are going to hear such things and see some very unpleasant things, would you, nonetheless, be able to consider a defense of insanity in this case and nonetheless be able to vote for it if you were satisfied Larry Scott was insane at the time of this act?
\*\*\*

\*\*\* [A]s a legal concept a person who is accused of a crime may not be responsible if, because of a mental illness or disease, he is unable to conform his conduct to the requirements of the law, that is, he is unable, because of his disease, to do right instead of wrong.

Do all four of you agree with that concept?
\*\*\*

Do you believe that a person who commits a crime can commit it while insane?
\*\*\*

\*\*\* [If] you find Larry Scott committed the crime while insane would you have any difficulty in returning a verdict of not guilty by reason of insanity?"

Questions similar to these were put to each prospective juror. We believe these questions were sufficient to allow defendant to uncover any biases against the insanity defense. Therefore the trial court did not abuse its discretion by precluding defendant from asking the specific question allowed by this court in *Stack*.

## VI

At trial defendant conceded that he killed the victim, but he relied on the affirmative defense of insanity. Defendant further limited the issues by conceding that

he understood the criminality of his acts. Therefore, the only issues at trial were whether defendant suffered from a mental disease or defect at the time he committed the acts, and whether defendant could conform his conduct to the requirements of the law.

Carolyn Kent, the victim's mother, testified that the victim was a student at the Moody Bible Institute and that she was studying to be a missionary in the inner city. Fred Peavy, a co-worker of the victim, testified that the victim left her job at the East Bank Health Club at approximately 9 o'clock on the night of the murder. Peavy also testified that it was approximately a 20-minute walk from the East Bank Club to the Moody Bible Institute.

Sarah Buschbaum identified defendant as the man who followed her on the night of August 4, 1984, in the vicinity of the Moody Bible Institute. The details of Buschbaum's testimony are described above.

Clifton Wright testified that on the evening of August 7, 1984, he was arrested and placed in a holding cell at the 18th district police station. While in the lockup, Wright met defendant. Defendant stated he had been arrested for murdering the "girl from the newspaper article" and that the guy he was with got the money. Wright also said defendant was masturbating in the lockup as he told Wright about the murder.

Numerous police officers and detectives testified to the details of the arrest and investigation. They also testified that defendant gave responsive answers to questions and that he appeared oriented to time and place. Assistant State's Attorney Snow testified that defendant gave a statement and that he appeared coherent and alert at the time he gave the statement. The statement was then published to the jury without objection.

Dr. Alan Rosenwald, a clinical psychologist, testified for the defense. Dr. Rosenwald examined defendant on

December 29, 1985, to determine defendant's sanity at the time of the crime. Dr. Rosenwald interviewed defendant for approximately 20 minutes, administered the Rorschach ink blot test, Wechsler Adult IQ test, Bender Gestalt test and the Projective Sentence Completion test. In addition to the tests he personally administered, Dr. Rosenwald reviewed defendant's mental history and reports prepared by other psychologists. Based on the above information, Dr. Rosenwald concluded that defendant was a schizophrenic with borderline defective intelligence. Dr. Rosenwald explained that schizophrenia is a psychosis which impairs the "reality testing" ability of those afflicted with the illness.

Dr. Rosenwald testified that although defendant was aware that his acts were criminal, due to his schizophrenia he was unable to conform his conduct to the requirements of the law at the time of the crime. Dr. Rosenwald stated that due to defendant's misinterpretation of the events around him, he would be unable to control his actions based on his own "internal controls." Dr. Rosenwald stated that if some form of external control were present, defendant would be more able conform his conduct to the requirements of the law. Dr. Rosenwald explained that "external control" refers to the ability to adapt one's thinking to some authority outside of one's self. Dr. Rosenwald testified that defendant could control his actions when he followed Buschbaum and the unidentified woman on August 7, because of the external controls present in the form of the doorman and police officers respectively. However, due to defendant's lack of internal controls, defendant could not conform his acts to the requirements of the law at the time he assaulted the victim. Dr. Rosenwald testified that defendant's act of hiding the victim's body shows that he understood the criminality of the act, but does not mean he could conform his acts to the requirements of the law.

On cross-examination, Dr. Rosenwald stated that he was aware that defendant had been examined at Cermak Hospital, but that he could not recall whether he had reviewed the records from those examinations. After a defense objection, the court took an overnight recess, during which time Dr. Rosenwald reviewed the "Cermak reports." Upon further cross-examination, Dr. Rosenwald testified that a notation in the Cermak reports dated September 5, 1984, indicated that defendant had a personality disorder, which is not a mental illness.

On redirect, Dr. Rosenwald stated that the Cermak reports were "progress notes" which were not necessarily based on comprehensive psychological examinations. Dr. Rosenwald also stated that he had reviewed psychological reports prepared by Dr. Garvin in 1983 and 1984. In the 1983 report, Garvin diagnosed defendant as a "social pathologic[al] individual with [a] psychotic underlay." The 1984 report was an "interim report" which referred to the 1983 report, but did not mention the "psychotic underlay."

Dr. Koziol testified for the defense that he examined defendant on December 30, 1985, to determine whether he was capable of making an intelligent waiver of his constitutional rights. Based on this examination, which is described above, Dr. Koziol diagnosed defendant as suffering from chronic schizophrenia with acute exacerbation and delusions. Dr. Koziol stated that although the projective tests which he administered to defendant showed that defendant was psychotic, defendant was capable of goal-directed behavior. However, Dr. Koziol said that defendant's goals would be abnormal.

Although the projective tests did not indicate that defendant had delusions, during the clinical interview Dr. Koziol discovered that defendant had delusions regarding race. Specifically, defendant believed that when he talked to Caucasians, they developed earaches and hives and

later became prejudiced. In addition, defendant believed the victim was black and Puerto Rican when, in fact, she was white.

During cross-examination, Dr. Koziol stated that defendant had told him that defendant's prior stays in mental hospitals were due to drug abuse. Defendant told Dr. Koziol that he was abusing "Ts and Blues," but Dr. Koziol did not inquire about the frequency of defendant's drug use.

Dr. Koziol also stated on cross-examination that he was unaware that defendant had been examined at the Cermak Hospital. In addition, Dr. Koziol was unaware that in August 1984, Dr. Garvin diagnosed defendant as having an antisocial personality disorder with a history of drug abuse. Dr. Garvin found no psychosis. Dr. Koziol stated that he based his opinion solely on his own examination of defendant and that he did not review the reports prepared by Doctors Rosenwald and Wasyliw. Dr. Koziol stated that defendant lacked internal controls, but that he could respond to external controls.

Dr. Glenn Prentice, a psychiatrist, testified for the defense. Dr. Prentice examined defendant in December 1985, at which time he conducted a clinical interview, and reviewed the reports from defendant's prior arrests and hospitalizations. Based on his examination and review of the medical records, Dr. Prentice diagnosed defendant as suffering from schizophrenia and delusions. Dr. Prentice stated defendant has been schizophrenic since at least 1979, when he was hospitalized with that diagnosis.

Dr. Prentice found that defendant suffered from delusions regarding a "women's labor pool." Dr. Prentice stated that defendant's delusions regarding women indicated that he felt women held unusual power and were malicious in some way. Dr. Prentice stated that defendant might conceal his delusional belief system. However,

Dr. Prentice also testified that defendant had a history of acting out against women. For example, in 1982 defendant robbed a woman and in 1983 he molested three women.

In explaining his diagnosis that defendant was schizophrenic since at least 1979, Dr. Prentice read extensively from the records of defendant's prior hospitalizations. Dr. Prentice believed these records indicate defendant was hospitalized for schizophrenia and not drug abuse. To support his diagnosis, Dr. Prentice also relied on notations from the Cermak reports indicating symptoms of schizophrenia.

Dr. Prentice stated that defendant was schizophrenic on August 4, 1984. While Dr. Prentice believed defendant understood the criminality of his acts, defendant could not conform his conduct to the requirements of the law. Dr. Prentice stated that the circumstances surrounding defendant's arrest indicate that defendant could control his conduct when some form of external control was exerted but that he could not control his acts when he was alone with a woman.

On cross-examination, Dr. Prentice conceded that although defendant mentioned other delusions to different doctors, he never mentioned the "women's labor pool" to another doctor. Nor did defendant mention any of his delusions during his statement to Assistant State's Attorney Snow on August 8, 1984. Dr. Prentice also stated he did not discuss the facts of the case with defendant.

On cross-examination, the State asked Dr. Prentice whether he was aware that defendant beat his wife and forced her to engage in oral and anal sex with him. Dr. Prentice stated he was not aware of this behavior, but later on redirect he stated this behavior would be consistent with his diagnosis.

Dr. Prentice was aware that some notations from defendant's 1980 stay in a Department of Mental Health

hospital indicate defendant may have been faking halluci-
nations at that time. Dr. Prentice was not aware that
defendant told other doctors that his previous hospital
stays were due to his drug abuse. However, when
defendant was discharged from the hospital on Novem-
ber 12, 1980, he was diagnosed as having schizo-effective
disorder.

Dr. Prentice may not have been aware that shortly
prior to killing the victim defendant followed Busch-
baum. Dr. Prentice stated that this shows defendant had
purposeful behavior and that at least to some extent he
was in control of his actions. On redirect, he stated that
at the time defendant followed Buschbaum the doorman
exerted external control over defendant.

The State called Dr. Cavanaugh as a rebuttal witness.
Dr. Cavanaugh conducted clinical interviews of defend-
ant on May 9, June 3, and June 9, 1985, regarding
defendant's fitness to stand trial; and February 20, Feb-
ruary 27, March 17 and March 24, 1986, regarding
defendant's mental state at the time of the crimes. In
addition, on January 23, 1986, Dr. Cavanaugh examined
defendant to determine his competency to waive his fifth
amendment rights. These interviews lasted a total of ap-
proximately eight hours.

In addition to his personal interviews of defendant,
Dr. Cavanaugh interviewed defendant's ex-wife, Detec-
tive Sappanos and Assistant State's Attorney Snow. Dr.
Cavanaugh also reviewed the reports of other doctors
from the Isaac Ray Institute who had interviewed
defendant's mother and Sarah Buschbaum. Dr. Cava-
naugh also reviewed the Department of Mental Health
records from defendant's prior hospital stays and the
Cermak reports from the psychological screening con-
ducted at the Cook County jail.

Dr. Cavanaugh stated that on August 4, 1984,
defendant had symptoms of both a sociopathic personal-

ity disorder and a schizoid personality disorder. Dr. Cavanaugh stated that defendant's sociopathic personality disorder was evidenced by his drug abuse, theft, sexually abusive behavior, problems maintaining meaningful relationships and problems maintaining a job over an extended period. A person with a schizoid personality disorder has no major thought disorder, but has difficulty relating with others. Neither of these personality disorders is a mental disease or defect as those terms are used in the insanity statute. In addition to the personality disorders, Dr. Cavanaugh diagnosed defendant as a sexual sadist.

Dr. Cavanaugh testified that according to defendant's ex-wife, defendant had a history of alcohol and drug abuse. Defendant's former wife also told the interviewing doctors that defendant had beaten his former wife and forced her to engage in oral and anal sex with him. Dr. Cavanaugh stated this indicates defendant was a sexual sadist.

Despite the diagnoses that at the time of his prior hospitalizations defendant was a paranoid schizophrenic, Dr. Cavanaugh stated that defendant's hospitalizations were probably due to drug abuse. Dr. Cavanaugh stated that he does not agree with the diagnoses of schizophrenia made at the time of the hospitalizations.

Dr. Cavanaugh stated that in his opinion the issue is whether defendant could control his impulses or whether he was irresistibly driven to commit the crime. Dr. Cavanaugh further said there is no such thing as an external impulse control. Dr. Cavanaugh stated that defendant's conduct in following Buschbaum combined with the facts that the attack occurred in a dark alley and that defendant hid the body indicate he was able to control his acts at the time of the offense. Similarly, according to Dr. Cavanaugh, defendant's conduct of following the unidentified woman at the time of his arrest indicates he could

control his acts. Finally, Dr. Cavanaugh stated that he found no evidence that defendant was psychotic. In addition, he stated that people do not rape as a by-product of psychosis.

Dr. Wayne Tuteur, a psychiatrist, testified for the State. Dr. Tuteur examined defendant on February 15 and 22, 1986, to determine defendant's sanity at the time of the offenses. In the course of his examination, Dr. Tuteur reviewed the police reports, defendant's statement, records from defendant's hospitalizations with the Department of Mental Health, the Cermak reports and records from the Psychiatric Institute relating to examinations of defendant conducted in 1983, 1984 and 1985.

Dr. Tuteur stated that defendant was not mentally ill at the time of the offenses and that he was able to conform his conduct to the requirements of the law. Dr. Tuteur stated that defendant's behavior towards Buschbaum indicates that he was looking for female companionship and was capable of controlling his conduct.

On cross-examination, Dr. Tuteur stated that he was aware that defendant had been hospitalized four times between 1979 and 1981 and that each time defendant was discharged with a diagnosis of schizophrenia. In addition, Dr. Tuteur was aware of reports prepared in 1983 by Dr. Stipes and Dr. Garvin which found defendant was schizophrenic. Based on his own examination of defendant, Dr. Tuteur disagreed with any diagnosis finding defendant is or was schizophrenic. Dr. Tuteur relied on the Cermak reports for his diagnosis that defendant had only a personality disorder, even though some notations in the Cermak reports show defendant had some symptoms of schizophrenia. Dr. Tuteur also disagreed with Dr. Reifman's opinion that defendant was schizophrenic,

"since on other occasions Dr. Reifman has other diagnoses and found him fit and sane."

On redirect examination, Dr. Tuteur stated that civil commitment procedures could be instituted against a psychotic individual who signs himself out of a mental hospital.

Defendant called Dr. Michael Rabin, a clinical psychologist with the Psychiatric Institute, as a surrebuttal witness. Dr. Rabin examined defendant on September 24, 1985, to determine defendant's fitness for trial. During his examination of defendant, Dr. Rabin administered the Rorschach test, Thematic Aperception Test and MMPI. Defendant was uncooperative at first, but later improved in this area. Based on his examination of defendant, Dr. Rabin diagnosed defendant as suffering from schizo-effective disorder, which is a combination of manic depression and schizophrenia.

Defendant attempted to have Dr. Rabin explain defendant's answers to 10 Rorschach cards. However, without State objection, the court refused to allow defendant to introduce all 10 cards. Instead, defendant had Dr. Rabin explain in detail defendant's responses to two Rorschach cards which most show defendant's psychosis. Dr. Rabin stated that defendant's answers indicated that he had poor impulse control.

Dr. Rabin reviewed a report prepared by Dr. Wasyliw regarding the MMPI administered by the latter. Dr. Wasyliw concluded that defendant had no pathology, but Dr. Rabin's own MMPI showed a clear pathology.

Dr. Rabin reviewed a report prepared by Dr. Garvin in 1983. During his direct testimony, Dr. Rabin read the following portion of Dr. Garvin's report:

"Patient is basically a primitive impulse ridden, streetwise sociopathic individual with a psychotic underlay. He is unstable and has a strong need to provoke. There is probably sufficient underlying delusional mate-

rial to regard him as a residual schizophrenic, but his essential sociopathy is even more prominent. Seen as fit for trial if he chooses to cooperate with counsel. No evidence of insanity at the time."

Dr. Rabin then stated that in his opinion, defendant was underdiagnosed in 1983 by Dr. Garvin.

On cross-examination, Dr. Rabin stated that he was aware Dr. Wasyliw had administered some of the same tests and concluded defendant was not psychotic. Dr. Rabin also testified that defendant began cooperating after Dr. Reifman reminded him that his lawyers had sent him to see Dr. Rabin. Defendant's answers to Dr. Rabin's questions during the clinical interview showed no signs of psychotic thinking. Dr. Rabin had no opinion about whether defendant was insane at the time of the offense.

Defendant's last witness on surrebuttal was Dr. Reifman. Dr. Reifman testified to the various tests and diagnoses described above in relation to the fitness hearing. Dr. Reifman explained that his diagnosis changed because defendant's mental state fluctuates and because defendant masks his psychosis when he is under stress. Dr. Reifman asked Dr. Rabin to administer psychological tests, and later Dr. Reifman reviewed the results of those tests.

Dr. Reifman concluded that defendant was schizophrenic on August 4, 1984, but he had no opinion about whether defendant could conform his conduct to the requirements of the law. Dr. Reifman agreed that defendant is sadistic, but stated that the sadism is a function of his psychosis, and not a primary diagnosis.

On cross-examination, Dr. Reifman testified that he had previously found defendant to be suffering only from a personality disorder. Dr. Reifman also stated that he is not aware that defendant ever repeated the delusional statements to other doctors. Finally, Dr. Reifman stated

that he had no opinion about whether defendant was insane on August 4, 1984.

## VII

Defendant raises a series of arguments related to the State's use of the Cermak reports. As stated above, the Cermak reports are the patient progress notes prepared while defendant was at the Cermak Hospital, which is affiliated with the Cook County jail. Although defendant initially objected to the use of the reports on the grounds that the reports were not produced during discovery, that objection was later withdrawn. Nevertheless, defendant now contends that the prosecution's use of these reports was improper.

Initially, we note that the contents of the Cermak reports may be admitted for the limited purpose of explaining the basis of the expert witnesses' opinions. (Fed. R. Evid. 703; *People v. Anderson* (1986), 113 Ill. 2d 1.) Under Rule 703 of the Federal Rules of Evidence, "expert witnesses may disclose the contents of otherwise inadmissible materials upon which they reasonably rely." (*Anderson*, 113 Ill. 2d at 8-9, citing *Wilson v. Clark* (1981), 84 Ill. 2d 186.) Under Federal Rule 703 the ordinary foundation requirements are replaced by a showing that the information is of a type upon which experts in the field reasonably rely.

Defendant asserts that the Cermak reports were not reasonably reliable because it is unclear who examined the defendant, how long the examinations lasted or what the exams entailed. In response, the State observes that the same objections apply to the records from defendant's prior hospitalizations. Defendant also notes that at least two of the notations in the Cermak reports were made by student interns. Based on these facts, defendant argues that the Cermak reports were inherently unreliable. However, defendant did not object to the use of

these reports at trial. If, as defendant argues, the reports are unreliable, he should have objected on this ground when the reports were first discussed at trial. Instead, defendant elicited testimony from his own experts that the Cermak reports supported their findings that defendant was schizophrenic. Thus, defendant has waived review of this claim. Further, the use of the Cermak reports does not constitute plain error. While the experts disagreed as to the meaning of the Cermak reports and the weight to be accorded them, no expert testified that the reports were so untrustworthy that they could not reasonably be relied upon in the formation of a psychiatric opinion.

Testimony at trial established that prior psychiatric history is an important tool in making a diagnosis as to defendant's mental state at the time of the offense. Indeed, the defendant relied heavily upon the records from his prior hospitalizations to show that he had a long history of schizophrenia. Similarly, State witnesses Dr. Cavanaugh and Dr. Tuteur, as well as defense expert Dr. Prentice, testified that they relied on the Cermak reports in making their diagnoses. The fact that three separate experts, including defense expert Dr. Prentice, relied on the Cermak reports in reaching their opinions shows that these records are of a type reasonably relied upon by experts in the field. Therefore, the contents of the reports could be disclosed for the limited purpose of showing the bases of these experts' opinions, even though the reports were not entered into evidence.

Nevertheless, defendant argues that it was improper to use the Cermak reports to impeach the testimony of Dr. Rosenwald and Dr. Koziol. Defendant asserts that neither of these doctors had reviewed the reports prior to testifying, and that neither doctor relied on the reports to form his opinion. Therefore, defendant maintains it was error for the State to cross-examine these

doctors about the contents of the Cermak reports. We disagree.

Initially, we note that Dr. Rosenwald reviewed the Cermak reports during a court recess. Even if Dr. Rosenwald had not relied on these reports prior to his direct testimony, he was aware of the reports when he testified as to his opinion on cross-examination. Further, the State did not use the cross-examinations to elicit information which could not otherwise come before the jury. (See Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness*, 1986 U. Ill. L. Rev. 43, 70.) The contents of the reports were properly brought out during the direct examination of the State's own experts. Given that the reports are of a type reasonably relied upon by experts in the field, we believe it was proper for the State to inquire as to what weight, if any, the defense experts accorded the reports.

Defendant next asserts that the State erred by arguing the substantive truth of the Cermak reports, as well as other evidence which was admissible for the limited purpose of showing the basis for an expert's opinion. Specifically, defendant assigns error to the State's arguments relating to the Cermak reports, defendant's mistreatment of his former wife, defendant's history of substance abuse and defendant's alleged malingering during his prior stay in the Department of Mental Health hospital. Defendant argues that this evidence was admissible, if at all, only as the basis for an expert's opinion. Defendant further argues that by arguing the substantive truth of this evidence the State deprived defendant of a fair trial.

This evidence was properly admissible for the limited purpose of explaining the basis for an expert's opinion. (*Anderson*, 113 Ill. 2d 1; *Clark*, 84 Ill. 2d 186.) Ordinarily a limiting instruction is the proper remedy when evi-

dence is admitted for only a limited purpose and defendant would have been entitled to such an instruction upon request. (Fed. R. Evid. 105; *People v. Garza* (1981), 92 Ill. App. 3d 723, 733.) However, not only did defendant not request a limiting instruction, but he also argued this type of evidence substantively. Under these circumstances, we cannot say that defendant was deprived of a fair trial by the court's failure to *sua sponte* inform the jury that this type of evidence was admissible only to show the bases of the experts' opinions.

Defendant next argues that statements he made to Dr. Tuteur and Dr. Cavanaugh during court-ordered psychiatric examinations should have been suppressed. Defendant contends the trial court erred by not advising defendant that statements he made during these examinations could only be used as evidence on the issue of insanity, that he had a right to refuse to cooperate with the examining psychiatrists, but that if he did not cooperate he could not present expert testimony for the insanity defense if that testimony was based on the expert's examination of defendant. (Ill. Rev. Stat. 1983, ch. 38, par. 104—14.) The statute on which defendant relies applies only to court-ordered fitness examinations. The statute which applies to court-ordered insanity examinations does not require admonishments from the court. Ill. Rev. Stat. 1983, ch. 38, par. 115—6.

Because defendant did not raise this issue in the trial court, or include it in a timely filed post-trial motion, it is not clear from the record which statements were made by defendant during each particular interview. Therefore, defendant has waived appellate review of this issue. Further, because defendant cannot show any harm resulting from the court's failure to provide the admonishments, the error did not deprive defendant of a fair trial.

Dr. Tuteur examined defendant after the court had already held a fitness hearing, and the examinations were for the purpose of determining defendant's mental state at the time of the offense. The statements to Dr. Cavanaugh were made during eight interviews with the defendant. Four of these interviews with Dr. Cavanaugh were for the purpose of determining defendant's sanity at the time of the offense, three were for the purpose of determining defendant's fitness to stand trial and one was for the purpose of determining his competency to waive his constitutional rights. Therefore, the court had no statutory duty to advise defendant of his rights prior to the interviews by Dr. Tuteur and five of the eight interviews by Dr. Cavanaugh. In addition, the United States Supreme Court has held that compulsory psychiatric examinations do not violate the fifth or sixth amendment when a defendant places his mental state at issue. (*Buchanan v. Kentucky* (1987), 483 U.S. 402, 424, 97 L. Ed. 2d 336, 356, 107 S. Ct. 2906, 2918; see *People v. Gacy* (1988), 125 Ill. 2d 117, 143.) Therefore, there is no error with respect to the court-ordered insanity examinations.

With respect to the fitness interviews, defendant is correct that the trial court should have admonished defendant of his rights. Given this error, defendant had two possible options. First, defendant could have moved the trial court to suppress the statements defendant made during these interviews. Under this option, defendant would not have been permitted to present expert testimony based on the expert's examination of defendant. (Ill. Rev. Stat. 1983, ch. 38, par. 104–14.) Second, defendant could have presented expert testimony to support the insanity defense, in which case the statements made during the fitness examination would be admissible, despite the trial court's error. Defendant proceeded under the second option. In its case in chief, the defense

called Doctors Rosenwald, Koziol and Prentice, each of whom testified based on his own examination of defendant. This testimony would not have been admissible had defendant not cooperated with the court-ordered examinations. (Ill. Rev. Stat. 1983, ch. 38, par. 104—14.) By presenting this expert testimony, defendant invited the State to present evidence of the statements defendant made during the court-ordered fitness examinations. Therefore, we find the court's failure to admonish the defendant was harmless error.

Defendant next argues that the prosecution improperly elicited testimony that defendant was fit to stand trial. Over defense objection, Dr. Cavanaugh testified on direct examination that he administered a competency screening test and found defendant was fit for trial. As part of his answer, Dr. Cavanaugh explained the definition of "fitness."

The next reference to defendant's fitness occurred during the defense cross-examination of Dr. Tuteur, when the witness made an unsolicited reference to the fact that Dr. Reifman had previously found defendant fit for trial.

Defendant returned to the subject during the direct examination of Dr. Rabin, during which defendant had the witness read a report prepared in 1983 by Dr. Garvin. That report stated that defendant was "[s]een as fit for trial if he chooses to cooperate with counsel. No evidence of insanity at the time." Over defense objection, during its cross-examination of Dr. Rabin, the State had the witness re-read the above portions of Dr. Garvin's report.

During its direct examination of Dr. Reifman, defendant had the witness recount his various diagnoses regarding defendant's fitness. Dr. Reifman then explained that defendant's fluctuating mental illness caused the discrepancies in Reifman's diagnoses. The State then

cross-examined Dr. Reifman on his varying findings of fitness.

Defendant correctly states that evidence that defendant is fit for trial is irrelevant to a determination of whether defendant was insane at the time of the crime. (*People v. Murphy* (1978), 72 Ill. 2d 421; *People v. Cornelius* (1946), 392 Ill. 599.) However, the State argues that defendant has waived review of this issue because he did not make a contemporaneous objection to each reference, and because defendant himself interjected most of the references to his fitness. We agree. At least five references to defendant's fitness were attributable to questions by defendant. In addition to the number of references, the most damaging references appear to be those which defendant himself solicited. Defendant may not be heard to complain of errors which he injected into his own trial. See *People v. Gacy* (1984), 103 Ill. 2d 1, 74.

Further, we believe any references to defendant's fitness were harmless error. The initial reference to fitness by Dr. Cavanaugh included a definition of fitness, which differentiated a finding of fitness from the ultimate issue in this case—whether defendant could conform his conduct to the requirements of the law. In addition, the State did not argue any of the fitness evidence to the jury. Therefore, the references made by the State did not deprive defendant of a fair trial.

In a related argument, defendant contends that evidence which showed that in 1983 Dr. Stipes found defendant sane is irrelevant. On cross-examination of Dr. Tuteur, defendant established that in 1983 Dr. Stipes diagnosed defendant as a residual schizophrenic. During redirect of Dr. Tuteur, the State elicited testimony that despite this diagnosis Dr. Stipes found defendant sane at that time. Defendant is correct that such evidence is irrelevant and should not have been introduced. However,

we find that this error was harmless. Taken in context, this testimony was used to show that it was possible for defendant to be both schizophrenic and sane. The State did not argue that the evidence of sanity in 1983 indicated defendant was sane at the time of the offense. In fact, the State argued that the jury should deliberate only on defendant's mental state at the time of the offense.

In addition, we note that later in the trial defendant introduced similar evidence through the testimony of Dr. Rabin. During his direct testimony, Dr. Rabin read a 1983 report prepared by Dr. Garvin who found defendant was sane in 1983. The State then revisited the topic during cross-examination of Dr. Rabin. While we agree that this evidence was irrelevant, defendant may not be heard to complain of error which he injected into his own trial. (*Gacy*, 103 Ill. 2d at 74.) Given the fact that defendant introduced identical irrelevant evidence, we find the State's introduction of testimony regarding Dr. Stipes' prior finding of sanity was harmless error.

## VIII

Defendant next raises a series of arguments concerning the jury instructions. Specifically, defendant argues that the trial court did not properly allocate the burden of proof for a verdict of guilty but mentally ill; that the court erred by not including an insanity instruction with the issues instructions for each separate offense; that the court misinstructed the jury to consider the insanity defense only after finding defendant guilty on all charges; that the court misinstructed the jury that the insanity defense related only to the murder charge; that the court erroneously instructed the jury that it could return a verdict of not guilty by reason of insanity only if it found defendant was insane on August 4, 1984, rather than at the time of the offense; and that the court misin-

structed the jury that it could find defendant guilty of felony murder if it found he committed the acts causing the victim's death "while attempting to commit attempt robbery."

Defendant concedes he did not object to the instructions given, did not tender his own instructions and did not include these arguments in a post-trial motion. Nonetheless, defendant asks that we consider these questions under our Rule 451(c) (134 Ill. 2d R. 451(c)), which provides that "substantial defects [in jury instructions for criminal cases] are not waived by failure to make timely objections thereto if the interests of justice require." (134 Ill. 2d R. 451(c).) Because each of defendant's arguments raises different questions, we will consider them separately.

The trial court gave the following instructions relevant to a GBMI verdict:

"A person is guilty but mentally ill at the time of the commission of the an offense, a person is guilty but mentally ill [sic] if at the time of the commission of an offense, he was not insane but was suffering from a mental illness.

\* \* \*

Mental illness means a substantial disorder of thought, mood or behavior which afflicted a person at the time of the commission of the offense, and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior, or is unable to conform his conduct to the requirements of law.

\* \* \*

If, from an examination of all of the evidence in the case you are convinced that the Defendant has been proven guilty beyond a reasonable doubt of the offense of murder [attempted robbery] [aggravated criminal sexual assault], but at the time of the commission of the act, he

was mentally ill, though not insane, you will use [the guilty but mentally ill] form of verdict."

In addition, the trial court gave the following instruction relevant to the insanity defense:

"On the question of sanity of the Defendant on August 4, 1984, the burden of proof rests on the Defendant.

In order to sustain this burden, the Defendant must prove by a preponderance of the evidence that on August 4, 1984, he suffered from a mental disease or defect which caused him to lack substantial capacity to appreciate the criminality of his conduct, or if he did recognize his acts as criminal, that with [*sic*] because of his mental illness or disease, lacked substantial capacity to conform his conduct to the requirements of the law.

If you find from a preponderance of the evidence that the Defendant was insane at the time he committed the acts which caused the death of Kristin Kent, you should find him not guilty by reason of insanity.

If, on the other hand, you'd find from all of the evidence that the Defendant was sane, then you should find him guilty or guilty but mentally ill."

We first consider defendant's argument regarding the GBMI instructions. Under the GBMI statute in effect at the time of the instant offenses, the State had the burden of proving beyond a reasonable doubt that defendant committed the criminal acts, that defendant was mentally ill at the time he committed the acts and that defendant was not legally insane at the time. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) Defendant argues that the above instructions were improper in that they did not inform the jury that the State had the burden of proving beyond a reasonable doubt that defendant was sane. Therefore, defendant argues his convictions must be reversed under *People v. Fierer* (1988), 124 Ill. 2d 176.

The State initially asserts that defendant has waived appellate review of the instructional error because he did

not make a timely objection during the instructions conference, or include the error in his post-trial motion for new trial. However, as this court observed in *Fierer*, " ' "[c]ertain basic instructions, essential to a fair determination of the case by the jury (*e.g.*, *burden of proof*, elements of offense charged), must be given, and the concept of waiver will not be employed to bar reversal if a defendant has been convicted in the absence of these instructions." ' " (Emphasis in original.) (*Fierer*, 124 Ill. 2d at 186, quoting *People v. Roberts* (1979), 75 Ill. 2d 1, 13.) Thus, as in *Fierer*, despite the lack of a timely objection and the failure to include the issue in a post-trial motion, we will not deem the issue waived. *Fierer*, 124 Ill. 2d at 187; *People v. Johnson* (1991), 146 Ill. 2d 109.

In *Fierer*, the trial court incorrectly instructed the jury that for a GBMI verdict, the State had the burden of proving by a preponderance of the evidence that the defendant was sane at the time of the crime. (*Fierer*, 124 Ill. 2d at 186.) Subsequently, the jury found defendant guilty but mentally ill. On review, this court noted that the tendered instruction diluted the State's burden of proof for a GBMI verdict and, thereby, made it easier for the jury to reach this verdict. The instructional error harmed the defendant in that had the jury been properly instructed it may have been faced with the more difficult decision between verdicts of guilty and not guilty by reason of insanity. (*Fierer*, 124 Ill. 2d at 187.) Because it was impossible to determine what the jury's verdict would have been if proper instructions had been given, this court reversed the defendant's conviction and remanded for a new trial. *Fierer*, 124 Ill. 2d at 191.

The State argues that the holding in *Fierer* does not apply because the trial court did not misstate the burden of proof but, rather, the court did not allocate the burden of proof at all. The State argues that this lack of allocation of the burden of proof is less harmful than a

misallocation. In *People v. Johnson* (1991), 146 Ill. 2d 109, this court held that, under the GBMI statute, instructions which failed to allocate the burden of proof for a verdict of GBMI were erroneous. The error in *Johnson* was harmless because a proper instruction would have placed the burden of proof on the State for an element the State was trying to disprove (*i.e.*, whether the defendant was mentally ill). In this case, the lack of allocation occurred in an element which the State was attempting to prove (*i.e.*, that defendant was not insane). Therefore, we reject the State's argument that *Fierer* does not apply because the instructions did not allocate the burden of proof at all.

The instructions quoted above did not properly inform the jury of the State's burden of proof under the GBMI statute. Ironically, the error in the GBMI instruction is compounded because the trial court properly instructed the jury that for a verdict of not guilty by reason of insanity defendant had the burden of proving his insanity by a preponderance of the evidence. This instruction introduced the preponderance standard to the jury on the issue of defendant's insanity and placed the burden of proof on defendant. However, the court never instructed the jury that the State had the burden of proving defendant's sanity beyond a reasonable doubt for a GBMI verdict. "[J]ury instructions on the issues of GBMI and insanity must reflect the burdens of proof contained in their respective statutes." (*Fierer*, 124 Ill. 2d at 191.) Given the confusing nature of the statutes in effect at the time of the trial, it is unlikely that the jury was aware of the State's burden of proof for a GBMI verdict. Therefore, we find that the court's instructions were improper under *Fierer*, and we must now consider whether this error was harmless.

Because the jury returned verdicts of guilty for the offenses of murder and attempted robbery, we find the

instructional error did not affect the jury's verdict with respect to these charges. The erroneous GBMI instruction diluted the State's burden of proof and, thereby, made it easier for the jury to reach this verdict. However, with respect to the charges of murder and attempted robbery, the jury rejected the GBMI verdict and found defendant guilty. Because a proper instruction would have made it more difficult to return a verdict of GBMI, there is no reason to believe that a proper instruction would have affected the verdicts for the charges of murder and attempted robbery. Therefore, we find the instructional error was harmless beyond a reasonable doubt with respect to defendant's conviction on these charges. See *People v. Seuffer* (1991), 144 Ill. 2d 482; *People v. Johnson* (1991), 146 Ill. 2d 109.

On the other hand, the jury found defendant guilty but mentally ill of aggravated criminal sexual assault. Thus, the instructional error falls squarely within this court's holding in *Fierer*. By diluting the State's burden of proof for a GBMI verdict, the improper instructions made it easier for the jury to reach this verdict. Thus, the improper instructions may have caused the jury to avoid the more difficult choice between verdicts of guilty and not guilty by reason of insanity. Nonetheless, we find the instructional error was harmless. Despite the conflicting expert testimony, we believe the evidence overwhelmingly established defendant's sanity at the time of the charged offenses. Of the numerous expert witnesses that defendant called to testify, only two testified that he was insane at the time he committed the offenses. Moreover, even defendant's experts testified that his actions in following Sarah Buschbaum and the unidentified woman on August 7, 1984, indicate that he was, at least to some extent, able to conform his actions to the requirements of the law. Even though defendant's

experts qualified their opinions on this matter, we find this testimony persuasive that defendant was not insane.

Further, we note that the jury's verdicts show that it found defendant was not insane with respect to the offenses of murder and attempted robbery. With the exception of testimony that defendant was a sexual sadist, the evidence presented for the issue of insanity would apply equally to the charged offenses. Therefore, we do not believe that the jury would have found defendant not guilty by reason of insanity if it had received proper jury instructions for the issue of guilty but mentally ill.

Defendant next raises four arguments concerning the tendered insanity instruction. Defendant first argues that the court erred by not including a separate insanity instruction with the issues instructions for each offense. Defendant contends that a single catch-all insanity instruction was insufficient because it may have confused the jury. As support, defendant cites the 1989 supplement to the Illinois Pattern Jury Instructions (IPI) which recommends including the insanity instruction at the end of the issues instruction for each offense. However, as defendant concedes, the IPI in effect at the time of the trial made no such direction. While we believe that separate instructions are less confusing, we do not believe that the failure to separately instruct the jury was such an error that it deprived defendant of a fair trial.

Defendant next argues that the court instructed the jury to consider the insanity defense only for the charge of murder. Defendant points to that portion of the insanity instruction which states, "If you find from a preponderance of the evidence that the Defendant was insane at the time he committed the acts which caused the death of Kristin Kent, you should find him not guilty by reason of insanity." Defendant argues this instruction prevented the jury from considering the insanity defense for each individual offense. We find this argument is

meritless. The jury received four verdict sheets for each offense—not guilty, not guilty by reason of insanity, guilty and guilty but mentally ill. Thus, the jury was aware that it should consider the insanity defense for each offense.

Defendant also argues that the court misinstructed the jury that defendant had the burden of proving he was insane on August 4, 1984, rather than at the time of the offense. Defendant contends that the tendered instruction misinformed the jury that defendant must have been in a continuous state of insanity throughout the day. While the court did mention that defendant had the burden of proof for the issue of his insanity on August 4, 1984, the court also instructed the jury to find defendant not guilty by reason of insanity if it found he was insane at the time he committed the acts. Reading the instruction in its entirety, we believe the jury was properly informed that it was to consider defendant's sanity at the time of the offenses.

Defendant's last challenge to the jury instructions relates to the following portion of the issues instruction for murder:

> "[When defendant committed the acts which caused Kristin Kent's death,] he was attempting to commit or was committing the offense of aggravated criminal sexual assault or attempt robbery."

Defendant contends this instruction misinformed the jury that it could find defendant guilty of murder if it found he caused the victim's death while "attempting to commit the offense of attempt robbery." As noted above, defendant did not object to this instruction at trial and did not propose an alternative instruction. Thus, the issue is waived. Further, although the instruction could have been phrased more clearly, we do not believe the instruction was so confusing that it deprived defendant of a fair trial.

## IX

Defendant next alleges that the Illinois insanity statute (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e)) and the Illinois affirmative defense statute (Ill. Rev. Stat. 1985, ch. 38, par. 3—2) violate the due process clauses of the United States and Illinois Constitutions because they place the burden of proving defendant's insanity on defendant. Initially, we note that our appellate court has consistently upheld both statutes against due process challenges. See, *e.g., People v. Clemons* (1989), 179 Ill. App. 3d 667; *People v. McDarrah* (1988), 175· Ill. App. 3d 284; *People v. Hightower* (1988), 172 Ill. App. 3d 678; *People v. Martin* (1988), 166 Ill. App. 3d 428.

The Illinois insanity statute provides in pertinent part:

> "When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity. *However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of each of the offenses charged,* and, in a jury trial where the insanity defense has been presented, the jury must be instructed that it may not consider whether the defendant has met his burden of proving that he is not guilty by reason of insanity until and unless it has first determined that the State has proven the defendant guilty beyond a reasonable doubt of the offense of which he is charged." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e).)

Similarly, the affirmative defense statute provides in part, "If the affirmative defense of insanity is raised, the defendant bears the burden of proving by a preponderance of evidence his insanity at the time of the offense." Ill. Rev. Stat. 1985, ch. 38, par. 3—2(b).

Defendant argues that sanity is a necessary element of the charged offenses and, therefore, placing the bur-

den of disproving his sanity violates due process under the Federal Constitution. (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.) In *Leland v. Oregon* (1952), 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002, the Supreme Court held that a State may require a defendant to prove his insanity beyond a reasonable doubt. Defendant argues that *Leland* does not apply because it was decided before *Winship*. Defendant's argument ignores the case law reconciling the two decisions.

In *Rivera v. Delaware* (Del. 1976), 351 A.2d 561, the Delaware Supreme Court followed *Leland* and upheld the constitutionality of its insanity statute which placed the burden of proof on the defendant. The Supreme Court dismissed the defendant's appeal, stating that the case did not present a substantial Federal question. (*Rivera v. Delaware* (Del. 1976), 351 A.2d 561, *appeal dismissed* (1976), 429 U.S. 877, 50 L. Ed. 2d 160, 97 S. Ct. 226.) The Court's summary dismissal in *Rivera* is a disposition on the merits, and may be given precedential weight. (See *Rivera*, 429 U.S. at 877, 50 L. Ed. 2d at 160, 97 S. Ct. at 226 (Brennan, J., dissenting, joined by Marshall, J.); *Hicks v. Miranda* (1975), 422 U.S. 332, 45 L. Ed. 2d 223, 95 S. Ct. 2281.) Further, in cases subsequent to *Winship*, the Court has cited *Leland* with approval. (See *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319; *Martin v. Ohio* (1987), 480 U.S. 228, 94 L. Ed. 2d 267, 107 S. Ct. 1098.) Therefore, despite the Court's holding in *Winship*, requiring defendant to prove his insanity does not violate the due process clause of the Federal Constitution.

It is possible, however, that the insanity statute runs afoul of the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I, §2). "Although the language of the two constitutions is the same, the scope of Illinois' due process provision need not be identical to that of the United States Constitution." (*Hightower*, 172 Ill. App.

3d at 683.) Even before *Winship*, this court held that "the prosecution has the burden of proving beyond a reasonable doubt all the material and essential facts constituting the crime. (*People v. Benson*, 19 Ill. 2d 50; *People v. Handzik*, 410 Ill. 295.)" (*People v. Weinstein* (1966), 35 Ill. 2d 467, 470.) Therefore, we will consider whether the insanity statute meets the due process requirements of our own constitution.

Defendant cites to section 4—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 4—1), which provides in pertinent part that "[a] material element of every offense is a voluntary act." Based on this statute, and this court's holding in *People v. Grant* (1978), 71 Ill. 2d 551, defendant argues that sanity is a material element of every offense. The issue in *Grant* was whether the trial court should have *sua sponte* instructed the jury on the defense of involuntary conduct because the defendant had presented evidence that his conduct was caused by an epileptic seizure. The trial court did instruct the jury on the insanity defense. This court noted the similarities between the two instructions as applied to the facts of the case and held that defendant was not denied a fair trial.

Although *Grant* was based in part on the similarities between the defenses of insanity and involuntary conduct, that case did not hold that sanity is an element of every crime under section 4—1. Nor do we believe that such a holding is appropriate here. Under the insanity statute, before considering whether the defendant has borne his burden of proving that he was insane, a jury must first find that the State has proved each element of the charged offense. (Ill. Rev. Stat. 1985, ch. 38, pars. 3—2, 6—2(e).) Presumably, at the time it drafted the insanity statute the legislature was aware that section 4—1 required a voluntary act as an element of every offense. By differentiating between proof of insanity and

proof of the elements of a crime, the legislature clearly indicated that it did not consider sanity and voluntariness to be identical. For these reasons, we hold that under section 6—2(e), a defendant's sanity is not an element of a charged offense and the Illinois Constitution does not prohibit placing the burden of proof on the defendant for this issue.

X

Defendant next argues that his convictions must be reversed because the State introduced and argued irrelevant and inflammatory evidence regarding the victim's personal characteristics. Defendant contends that the State presented this evidence in a manner which made it appear material to the issue of defendant's guilt and, thereby, denied defendant a fair trial. *People v. Bernette* (1964), 30 Ill. 2d 359.

We first consider the testimony which defendant claims is irrelevant and inflammatory. The State's first witness was Carolyn Kent, who testified as follows:

"Q. How are you related to the victim in this case, Kristin Kent?

A. I am her mother.

Q. I'd like to direct your attention to the first weekend of August, 1984. Did your daughter visit your family that weekend?

A. Yes. She spent the night at our house Friday night.

Q. And could you tell us approximately what time it was that you dropped her off at the el station on Saturday, August 4th of 1984?

A. It was approximately 11:00 or 12:00 in the morning that I dropped her off.

\* \* \*

Q. Can you tell us what type of school your daughter attended and what she was studying?

A. She was at Moody Bible Institute and she was studying missionary work. Specifically inner city studies.

Q. And was that her goal?

A. Yes. To work in the inner city.

Q. Did she have a part-time job or did she work anywhere?

A. She worked at East Bank Club in the city.

Q. Saturday around noon time on August 4 of 1984, that was the last time you saw your daughter alive?

A. That is right."

The prosecution's next witness was the victim's co-worker who, in addition to testifying about the time the victim left work on the night of her murder, testified that the victim was quiet and polite. Defendant did not object to any of this testimony and did not include the issue in his post-trial motion. Therefore, we need only consider whether the references to the victim's character "were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. (*People v. Owens* (1984), 102 Ill. 2d 88, 104.)" *People v. Albanese* (1984), 104 Ill. 2d 504, 518.

Defendant now argues that he was deprived a fair trial because these brief references to the victim's character were presented in a manner which made them appear relevant to the question of defendant's guilt. Defendant maintains it was unnecessary to call Carolyn Kent as a witness, because the victim's co-worker could testify as the life and death witness. In response, the State argues that the mother's testimony that defendant was a student at the Moody Bible Institute was relevant to show why the victim was in the vicinity of the school at the time of the assault. Moreover, the State argues that evidence that the victim was quiet and polite was relevant to refute defendant's statement that the victim directed racial slurs towards defendant. In fact, defense counsel argued that in light of the victim's character,

defendant's statement regarding the racial slurs was evidence that he was suffering from delusions. Given the fact defendant argued the relevance of the character evidence, we find that these references did not deny defendant a fair trial.

We next consider defendant's complaints regarding the prosecutor's remarks during opening and closing statements. In her opening statement, the prosecutor stated that the victim was a missionary student who dreamed of working in Chicago's inner city. The prosecutor then stated, "On August 4th of 1984 the defendant, Larry Scott, shattered that dream." During her summation, the prosecutor stated:

"What about Kristin Kent? Didn't she have any rights here? Didn't she have the right to live? Didn't she have the right to her hopes and her dreams, whatever they were? Didn't she? Well, he didn't think so behind that garage when he appointed himself judge, jury and executioner over that young woman."

Defendant did not object to these statements, nor did he include this issue in his post-trial motion. Thus, the issue is waived. Further, while these comments were improper, they do not constitute plain error. (See, *e.g., People v. Henderson* (1990), 142 Ill. 2d 258, 322; *People v. Harris* (1989), 132 Ill. 2d 366, 386; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 37; *People v. Bartall* (1983), 98 Ill. 2d 294, 323.) As in those cases, we do not believe that these brief statements deprived defendant of a fair trial. Therefore, we find these comments were harmless error.

## XI

Defendant next argues that the cumulative effect of trial errors deprived him of a fair trial. In addition to the alleged errors we have already considered, defendant maintains that: the court improperly admitted into evidence certain autopsy photographs of the victim; during

*voir dire* the jury was misled that drug use is legally inconsistent with the insanity defense; the jury was misinformed that proof of an irresistible impulse was necessary to establish defendant's insanity; Dr. Cavanaugh's testimony exceeded the area for which he was qualified as an expert and, thereby, invaded the province of the jury; Dr. Cavanaugh and Dr. Tuteur used inadmissible evidence to discredit records from defendant's prior stays in a Department of Mental Health hospital; Dr. Cavanaugh improperly testified regarding the ultimate issue in the case; Dr. Tuteur improperly testified that if defendant had been psychotic at the time he was discharged from the Department of Mental Health, he could have been civilly committed; the State was improperly permitted to cross-examine Dr. Rosenwald on whether a Ph.D. in psychology is similar to a law degree and about whether psychology "was a matter of personal opinion of the psychologist"; and the trial court erroneously limited Dr. Rabin's testimony to one Rorschach card. Of these alleged errors, only the issue of the photographs was properly preserved for review. With respect to the errors not properly preserved, we will only consider whether they amounted to plain error.

The State introduced numerous autopsy photographs into evidence. Defendant now complains that two of these photographs, which depict internal examination of the victim's epiglottis and windpipe, should not have been sent to the jury. Defendant argues the prejudicial impact of these photographs outweighs their probative value and, therefore, defendant deserves a new trial.

"Whether a photograph of a deceased person should be admitted in evidence normally rests with the discretion of the trial court and if such a picture has sufficient probative value it may be admitted in spite of the fact that the photograph may be gruesome and inflammatory." (*People v. Lefler* (1967), 38 Ill. 2d 216, 221.) Pho-

tos of the deceased may be properly used to prove the nature and extent of the injuries, the force necessary to inflict the injuries, and the manner and cause of death, and to assist the jury in understanding the pathologist's testimony. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 319-20.) In this case, defendant does not indicate what aspect of these photographs negates their probative value. Moreover, the challenged photographs were not included with the record. Accordingly, based on this record we are unable to say the trial court abused its discretion in admitting the photographs.

Defendant next contends that during *voir dire* the jury was misled about the legal standards for insanity. Specifically, defendant assigns error to two questions on *voir dire* which occurred on different days. Over defense objection the State asked one panel of prospective jurors whether they understood "that there is a difference between drug abuse and insanity?" Each prospective juror answered in the affirmative. The following day the defense asked a prospective juror whether he believed a person "could use drugs and nonetheless be insane." The court sustained the State's objection that this question was an incorrect statement of the law. Defendant now argues that these two questions, along with the trial court's rulings on the related objections, misled the jury about the legal standards for insanity. However, the jury was instructed to follow the law as given to them by the judge and, thereafter, the judge provided the proper legal definition of insanity. In light of this, and the fact the State did not argue that defendant committed the offenses due to drug abuse, we find there is no plain error. See *Gacy*, 103 Ill. 2d at 87; *Johnson*, 146 Ill. 2d at 141-42.

Similarly, we do not believe it was plain error for Dr. Cavanaugh to testify to an incorrect definition of legal insanity. In response to a State question regarding inter-

nal and external impulse controls, Dr. Cavanaugh testi-
fied:

> "In the issue of a defendant's capacity to conform their
> conduct to the requirements of the law, the issue is can
> they control their impulses or are they irresistibly driven
> to have to commit the antisocial or illegal act in ques-
> tion."

Defendant objected that Dr. Cavanaugh's answer was a
mischaracterization of the law. After reading the answer
back, the court overruled this objection. However,
defendant did not include this issue in his post-trial mo-
tion. Therefore, we will only consider whether this testi-
mony amounts to plain error.

Defendant correctly asserts that Dr. Cavanaugh's tes-
timony is inconsistent with the insanity statute, which
requires a showing that a defendant lacked "substantial
capacity" to conform his conduct to the requirements of
the law. Defendant maintains the court's error in over-
ruling his objection was compounded by the fact the
State argued Dr. Cavanaugh's qualifications to the jury.
As we previously stated, the jury was instructed to fol-
low the law as given by the judge. The insanity instruc-
tions tendered to the jury contained the correct legal
definition. We do not believe that the jury disregarded
the court's proper instructions in favor of two words
contained in Dr. Cavanaugh's testimony. Therefore, we
find the trial court's erroneous ruling on defendant's mo-
tion does not constitute plain error. See *Johnson*, 146 Ill.
2d at 142.

Defendant next argues that Dr. Cavanaugh invaded
the province of the jury when he testified, over defense
objection, that rape is not a by-product of psychosis.
Defendant complains that this testimony was improper
because it concerned the ultimate issue in the case and,
further, that the error was compounded when the State
argued this evidence to the jury. Under *People v. Harris*

(1989), 132 Ill. 2d 366, Dr. Cavanaugh's testimony was not improper. Accordingly, the State was also permitted to argue this evidence to the jury.

Defendant also asserts that Dr. Cavanaugh and Dr. Tuteur invaded the province of the jury when they discredited the diagnoses contained in the Department of Mental Health records from defendant's prior hospitalizations. Because we find that the complained-of testimony was not improper, the issue does not amount to plain error. Both of the State's experts reviewed the Department of Mental Health records and accorded them little weight in forming their opinions about defendant's mental state at the time of the offenses. The doctors testified that in their opinions defendant was not mentally ill and that his prior hospitalizations were due to drug abuse rather than schizophrenia. These experts formed their opinions based on the Department of Mental Health records, as well as their interviews with defendant, his former wife and his mother. We believe it is proper for these witnesses to explain to the jury why they placed such little emphasis on the Department of Mental Health records.

With respect to defendant's remaining claims of cumulative error, we have reviewed the record and found no plain error exists. Our conclusion is the same whether the alleged errors are considered individually or collectively.

Defendant next contends that his convictions must be reversed because the prosecutors engaged in a pattern of misconduct which deprived defendant of a fair and impartial trial. In support of this claim, defendant cites a litany of allegedly improper conduct by the prosecutors. Most of the alleged incidents of prosecutorial misconduct involve the introduction of evidence and comment thereon. We have already examined many of these claims and found no reversible error. Repackaging these argu-

ments in terms of prosecutorial misconduct does not alter our conclusion. In addition, some of defendant's claims are spurious and will not be addressed other than to say we have reviewed the record and found there was no error. Thus, we will only consider those claims of prosecutorial misconduct which relate to issues we have not already reviewed and which could be considered error.

Defendant claims the prosecutor argued facts not in evidence when she stated defendant "was truant when he was a young kid. He stole as a kid." "It is a fundamental principle of trial practice that an attorney's argument is to be based on the evidence and reasonable inferences drawn from the evidence." (*Henderson*, 142 Ill. 2d at 324-25.) Defendant is correct that there is no evidence of truancy in the record. However, defendant failed to object to this argument and did not include the issue in his post-trial motion. Therefore, defendant has waived review of this issue. (*Henderson*, 142 Ill. 2d at 322.) Further, we do not believe this isolated comment was so improper that it deprived defendant of a fair trial or so flagrant that it threatened to deteriorate the judicial process. See *Harris*, 132 Ill. 2d at 386.

Defendant also assigns error to a prosecution question about whether defendant withheld information from defense expert Dr. Koziol. Dr. Koziol testified that in forming his opinion that defendant was insane, he did not take into account any of the various reports from other doctors. After this testimony, the prosecutor asked whether the defense had refused to provide the records to Dr. Koziol. Defendant's objection to this question was sustained. We believe that the trial court's ruling on the objection was sufficient to cure the defect and, therefore, no reversible error exists.

## XII

Defendant next contends that the evidence did not es-

tablish his guilt under the felony murder doctrine because the victim's death may have preceded the act constituting aggravated criminal sexual assault. Therefore, defendant argues the State failed to prove that defendant was committing or attempting to commit this forcible felony at the time he performed the acts which killed the victim. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3).) Defendant did not include this issue in his post-trial motion and, therefore, the issue is waived.

Further, because we find defendant's argument lacks merit, the issue does not involve plain error. This court has previously rejected similar arguments and defendant has provided no valid basis for reconsidering it here. See, *e.g., People v. Johnson* (1973), 55 Ill. 2d 62, 67; *People v. Thomas* (1990), 137 Ill. 2d 500, 532.

### XIII

Having found that no reversible errors occurred during defendant's trial, we now address defendant's arguments related to his sentencing hearing. At the first phase of the sentencing hearing, the parties stipulated to the jury's verdicts and to the introduction of all evidence adduced at trial. The court found that defendant was eligible for the death penalty because he was above the age of 18, and he knowingly or intentionally caused the death of the victim in the course of committing aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)).

The following evidence was introduced at the second phase of the sentencing hearing. The State called Margaret Purnell, who testified that in 1979 defendant attempted to rob her. The State introduced a certified copy of conviction which showed defendant was convicted of theft from person for this offense.

The State also introduced a certified copy of defendant's 1983 conviction for unlawful restraint. This docu-

ment contained a notation that defendant had pled guilty to unlawful restraint and that a rape charge was dismissed. The State then called Steve Prokop to testify to the events underlying the 1983 charges. Prokop stated that he saw defendant assault a woman in 1983, and that it appeared defendant was having intercourse with the woman. The court sustained defendant's objection to the witness' characterization of the events as "intercourse." However, the court overruled defendant's objection that any evidence regarding the sexual nature of the offense was barred on the grounds that the rape charge was dismissed. Prokop later testified that he called the police to report a "rape in progress." The State then called Detective Charles Rhodes, who was "involved in the investigation of an alleged sexual assault on one Helen Rubert" on July 21, 1983. The court sustained a defense objection to questions relating to Rhodes' conversation with Rubert. At this point, the State terminated its examination of Rhodes.

The State also called Sergeant Edwin Jackson of the Cook County sheriff's department. Sergeant Jackson testified that in December of 1984, defendant was involved in a fight with prison guards. Sergeant Jackson stated that one of the prison guards was hit during the fight. As a result of this fight, defendant was placed in segregation for 29 days.

As its last witness, the State called Carolyn Kent, who testified to the effect the victim's death has had on her family. Carolyn Kent stated that her family has been depressed and has had a difficult time associating with others. She also stated "this man should be either incarcerated for life or [given the] death penalty."

Defendant did not introduce any new evidence in mitigation. Instead, defendant relied on the psychiatric testimony introduced at trial. Defendant argued that the psychiatric testimony, combined with the jury's verdict of

guilty but mentally ill, established the statutory mitigating factor of extreme mental or emotional disturbance.

Defendant now contends his death sentence must be reversed because the trial court improperly considered victim impact evidence in the form of Carolyn Kent's testimony. Defendant relies on *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, and *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207, to support his argument that the victim impact evidence violated his rights under the eighth amendment to the United States Constitution. While this case was under advisement in this court, the Supreme Court overturned those portions of *Booth* and *Gathers* which prohibited introduction of evidence dealing with the character of the victim and the effect of her death on her family. (*Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597.) The *Payne* Court held that if a State "chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." (*Payne*, 501 U.S. at 827, 115 L. Ed. 2d at 736, 111 S. Ct. at 2609.) Following the Supreme Court's invitation in *Payne*, this court recently held that such evidence is admissible in this State. *People v. Howard* (1991), 147 Ill. 2d 103; see also Ill. Rev. Stat. 1985, ch. 38, par. 1401 *et seq.* ("Bill of Rights for Victims and Witnesses of Violent Crime Act").

However, *Payne* did not overrule *Booth* with respect to the admissibility of evidence regarding the family's beliefs about the appropriate sentence in the case. Carolyn Kent testified as follows:

"[State's Attorney]: And, would you like to comment on the way that you and your family feel about the sentence in this case?

[Carolyn Kent]: Because of what's happened to us, and the tragedy of the whole affair, the sadness of what's

happened to our family and what might happen in society to other families, we feel that only a life imprisonment would be a just sentence.

[State's Attorney]: And, what is your feeling about the death sentence?

[Carolyn Kent]: I just feel that this man should be either incarcerated for life or death penalty."

This equivocal statement does not carry the same emotional impact as an impassioned plea for the death penalty. Indeed, the trial court specifically commended Carolyn Kent for not attempting to influence the court's sentencing decision. Under the facts of this case, we find that any evidence about the family's beliefs for the appropriate sentence was harmless beyond a reasonable doubt. See *People v. Crews* (1988), 122 Ill. 2d 266.

## XIV

Defendant next argues that collateral estoppel principles prohibit the court from considering whether defendant either intentionally or knowingly caused the death of the victim as those terms are used in the death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(b)). Defendant was charged under all three sections of the murder statute. Thus defendant could be convicted if the jury found that (1) he intended to kill or do great bodily harm to the victim or knew that his actions would cause the victim's death, or (2) he knew that his acts created a strong probability of death or great bodily harm, or (3) he was attempting or committing a forcible felony (other than involuntary manslaughter) from which death resulted. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3).) As stated above, the jury returned a general verdict of guilty of murder.

Defendant was found eligible for the death penalty because he caused the victim's death while committing the forcible felony of aggravated criminal sexual assault.

(Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).) However, under the death penalty statute, defendant would only be eligible if in committing the aggravated criminal sexual assault, he either intended to kill the victim or knew that his actions would cause death or great bodily harm. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(b).) Defendant now argues that, under collateral estoppel principles, the jury's general verdict should have prevented the trial judge from considering whether defendant acted with the mental state required under the death penalty statute. We disagree.

The doctrine of collateral estoppel applies to criminal as well as civil cases. (*People v. Williams* (1975), 59 Ill. 2d 557.) The doctrine bars relitigation of factual issues which have necessarily been decided in a former proceeding between the same parties. (*Williams*, 59 Ill. 2d at 560.) The doctrine will not apply if it is not clear that the former judgment or verdict necessarily decided the factual question at issue in the subsequent proceeding. *Williams*, 59 Ill. 2d at 562.

Defendant's argument assumes that the jury rejected the theories of knowing and intentional murder. No such assumption can be made from the jury's verdict. On the contrary, it is the "rule in this State that 'where an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count' " to which the proof is applicable. (*People v. Jones* (1975), 60 Ill. 2d 300, 309, quoting *People v. Lymore* (1962), 25 Ill. 2d 305, 308; see also *People v. Brackett* (1987), 117 Ill. 2d 170.) Thus, defendant's assumption that the jury rejected the theories of knowing and intentional murder is contrary to the law of this State. Accordingly, the trial court was not collaterally estopped from considering the issue of defendant's knowledge or intent.

Defendant makes a second collateral estoppel argument regarding the introduction of evidence of the 1983 rape charge. At the time of the 1983 offense, unlawful restraint was a lesser included offense of rape. (*People v. Alexander* (1984), 127 Ill. App. 3d 1007, 1018.) Defendant asserts that the conviction for unlawful restraint combined with the contemporaneous dismissal of the rape charge constitutes an acquittal of the rape charge. Defendant now argues that introduction of evidence related to the 1983 sexual offense violated defendant's rights against double jeopardy under the fifth amendment of the United States Constitution and article I, section 10, of the Illinois Constitution of 1970.

At the hearing on defendant's post-sentencing motion, the trial court stated: "I was made aware of the fact that the charges had been of rape, of criminal sexual assault had been dismissed. There had been a finding of some kind, not a finding of not guilty." The court then found that collateral estoppel did not preclude him from hearing "any evidence which has some bearing in the aggravation phase and which may give the finder of fact an opportunity to know [the] past history and background of the Defendant" in cases similar to the matter for which he has been convicted.

There is no dispute that the evidence relating to the unlawful-restraint charge is admissible at the second phase of the sentencing hearing. Defendant argues that due to his acquittal of rape, evidence of the alleged sexual attack may not be used to enhance his penalty in the instant case. The Supreme Court considered a similar argument in *Dowling v. United States* (1990), 493 U.S. 342, 107 L. Ed. 2d 708, 110 S. Ct. 668. In *Dowling*, the defendant was charged with robbing a bank. At trial, the prosecution elicited testimony that two weeks after the bank robbery, the defendant had broken into a woman's home and robbed her. At the time of defendant's trial

for the bank robbery, he had already been acquitted of the charges related to the woman. Nevertheless, the prosecution hoped to use this evidence to bolster the testimony of its identification witnesses for the bank robbery trial.

The Supreme Court held that the double jeopardy clause does not, in all circumstances, bar introduction of otherwise admissible evidence merely "because it relates to alleged criminal conduct for which a defendant has been acquitted." (*Dowling*, 493 U.S. at 348, 107 L. Ed. 2d at 717, 110 S. Ct. at 672.) The Court based its holding on the differences between the burden of proof necessary for a conviction in the first trial (*i.e.*, beyond a reasonable doubt) and the burden for introducing the evidence at the second trial (*i.e.*, jury could reasonably conclude that robbery occurred and defendant committed that act).

The Court also stated that, even if the burdens of proof had been the same, evidence of defendant's participation in the robbery for which he was acquitted could still be introduced. The Court explained that when determining whether collateral estoppel bars relitigation of an issue raised by a general verdict of acquittal, a court must:

> " 'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict on an issue other than that which the defendant seeks to foreclose from consideration.' " (*Dowling*, 493 U.S. at 350, 107 L. Ed. 2d at 719, 110 S. Ct. at 673, quoting *Ashe v. Swenson* (1970), 397 U.S. 436, 444, 25 L. Ed. 2d 469, 475-76, 90 S. Ct. 1189, 1194.)

Because Dowling's prior acquittal may have been based on a factor other than identity, the Court held that collateral estoppel did not bar introduction of the identity

evidence at the second trial. *Dowling*, 493 U.S. at 352, 107 L. Ed. 2d at 720, 110 S. Ct. at 674.

More directly on point, the Federal court of appeals in *United States v. Fonner* (7th Cir. 1990), 920 F.2d 1330, held that evidence of offenses for which a defendant had been acquitted could be considered by a sentencing judge in a subsequent prosecution. In *Fonner*, the court stated:

"Nothing in either the [Federal sentencing] guidelines or the Constitution prevents a [sentencing] judge from taking account of conduct in which the defendant engaged, whether or not an acquittal prevents the imposition of criminal penalties directly on that count." (*Fonner*, 920 F.2d at 1332.)

As the *Fonner* court noted, giving consideration to defendant's prior misconduct is not the equivalent of sentencing him on that misconduct. Rather, this evidence is used to provide the sentencer with a more complete picture of the defendant as a person. This complete picture may then be used in sentencing the defendant on the charge for which he was convicted.

It is important to note that the disputed evidence was admitted during the second phase of the sentencing hearing. This evidence was not used to establish defendant's eligibility for the death penalty. The standard for introduction of evidence at the second phase of a sentencing hearing is whether the evidence is relevant and reliable. (See *People v. Holman* (1989), 132 Ill. 2d 128, 155.) This standard is considerably less than proof beyond a reasonable doubt. Under the Court's holding in *Dowling*, collateral estoppel does not bar the State from introducing evidence of the rape charge during the sentencing hearing, so long as the evidence is relevant and reliable. In this light, we note that defendant does not contest the veracity of Prokop's testimony. Further, defendant had the opportunity to cross examine Prokop,

but declined to do so. Based on these factors, we find that the evidence was both relevant and reliable.

We also note that there are numerous reasons the rape charge could have been dismissed which have nothing to do with whether a sexual assault took place. While the record in the instant case does not indicate on what basis the rape charge was dismissed, it certainly does not indicate that a trier of fact determined defendant did not commit the alleged sexual acts. (*Dowling*, 493 U.S. at 352, 107 L. Ed. 2d at 720, 110 S. Ct. at 674.) Under the circumstances, we believe the trial court was entitled to consider the underlying facts of the 1983 incident in order to more fully understand defendant as an individual. *Fonner*, 920 F.2d at 1333.

### XV

Defendant next argues that the trial court erred by failing to accord weight to mitigating evidence that defendant suffered from a mental illness at the time of the offense. Before it imposed the death penalty, the court stated:

> "[W]hen I look at the evidence in this case, and when I can honestly say that I am looking at all of the evidence does not disclose one single iota of a mitigating factor that has been presented to this Court in this case, against the imposition of the death penalty."

Defendant points to this statement as proof that the court did not consider the statutory mitigating factor of "extreme mental or emotional disturbance." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2).) Defendant argues that, in light of the jury's verdict that he was guilty but mentally ill, as well as the evidence that defendant was suffering from borderline defective intelligence and schizophrenia, he has proved the existence of this statutory mitigating factor. Therefore, defendant maintains the death sentence must be reversed.

A decision to execute must be based upon reason rather than caprice and emotion. (*People v. Gleckler* (1980), 82 Ill. 2d 145, 162, citing *Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204.) In making its decision on whether to execute, the sentencing body must be permitted to consider " 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *Eddings v. Oklahoma* (1982), 455 U.S. 104, 110, 71 L. Ed. 2d 1, 8, 102 S. Ct. 869, 874, quoting *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965.

Under *Lockett* and *Eddings*, the eighth amendment prohibits a State from precluding a sentencing body from considering any potential mitigating evidence presented by the defendant. The eighth amendment does not, as defendant's argument implies, prescribe the weight which must be accorded that mitigating evidence. Further, this court has previously held that a verdict of guilty but mentally ill does not necessarily preclude imposition of the death penalty. (*People v. Crews* (1988), 122 Ill. 2d 266; see also *Penry v. Lynaugh* (1989), 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (holding the eighth amendment does not preclude execution of a mentally retarded man).) Thus, the relevant inquiry here is whether the trial court considered defendant's mental state as a mitigating factor.

We find that the trial court did consider the mitigating effects of defendant's mental state. Defendant's argument takes the court's statements out of context. Elsewhere in its ruling, the court discussed the psychiatric testimony presented at trial and found that defendant is "a sociopath, and in that sociopathic illness, there are some strands of schizophrenia." The court also found that defendant's mental illness did not rise to the level

of insanity. Clearly, at the time it imposed sentence, the court considered defendant's mental state at the time of the offense and found it was not sufficient to mitigate defendant's conduct in sexually assaulting and murdering Kristin Kent. We believe the trial court's finding on this matter was a proper exercise of its discretion. (See *People v. Christiansen* (1987), 116 Ill. 2d 96, 122 (supreme court will not lightly overturn trial court's findings during aggravation and mitigation phase of death penalty hearing).) In so holding, we note that the psychiatric testimony concerning defendant's mental state was conflicting. Further defendant was diagnosed as borderline defective rather than mentally retarded.

For similar reasons, we reject defendant's claim that his sentence is excessive, disproportionate and inappropriate in light of the evidence of his mental illness. As support, defendant cites numerous murder cases before the same trial judge in which a sentence less than death was imposed. The fact the trial court has not imposed the death sentence in other, unrelated cases does not automatically mean that imposition of this extreme penalty is inappropriate in this case. As stated earlier, the death penalty must be based on the character of the individual defendant and the nature of the crime. Because each case is unique, sentences imposed by the trial court in other cases add little to a determination of whether the death penalty is appropriate here.

## XVI

Defendant next argues that his death penalty was the result of an impermissible double enhancement. Defendant asserts the act of strangling the victim was used as the basis of the murder charge, and as the aggravating factor which enhanced the offense of criminal sexual assault to aggravated criminal sexual assault. Defendant also argues that the aggravated criminal sexual assault

conviction was then used to establish his eligibility for the death.

Defendant contends that defendant's act of strangling the victim was used in both instances. However, in addition to strangling the victim, defendant bit the victim's nipple and vagina. These acts of force were sufficient to establish aggravated criminal sexual assault, even if defendant did not strangle the victim. Thus "we are not confronted with a situation in which a single aggravating factor, such as striking the victim, constituted both the sole cause of the victim's death and the sole factor to support the finding of murder during the commission of an aggravated criminal sexual assault." (*People v. Terrell* (1989), 132 Ill. 2d 178, 222.) Because defendant's conviction for aggravated criminal sexual assault could be supported without relying on the acts which caused the victim's death, there is no impermissible double enhancement. *Terrell*, 132 Ill. 2d at 223.

Defendant next contends that his convictions for aggravated criminal sexual assault and attempted robbery must be vacated because they are lesser included offenses of felony murder. As previously stated, the jury was instructed on all three theories of murder and returned a general verdict of guilty. It is the "rule in this State that 'where an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count' " to which the proof is applicable. (*People v. Jones* (1975), 60 Ill. 2d 300, 309, quoting *People v. Lymore* (1962), 25 Ill. 2d 305, 308; see also *People v. Brackett* (1987), 117 Ill. 2d 170.) Thus, defendant's murder conviction is supported under the intentional and knowing theories. Neither aggravated criminal sexual assault nor attempted robbery is a lesser included offense of murder under these theories. Therefore, defendant's

convictions for these lesser crimes do not merge into his murder conviction.

## XVII

Defendant next argues that numerous trial errors were incorporated into the sentencing hearing and so infected the latter proceeding as to make it inherently unreliable. We have already considered these allegations of trial error and in most cases found there was no error. We do not believe that those trial errors which we found were harmless denigrated the reliability of the sentencing hearing.

Defendant next presents a series of arguments pertaining to the constitutionality of the Illinois death penalty statute. This court has previously considered and rejected each of defendant's arguments. (See, *e.g., People v. Free* (1983), 94 Ill. 2d 378; *People v. Guest* (1986), 115 Ill. 2d 72; *People v. Perez* (1985), 108 Ill. 2d 70.) Because defendant has not provided a sound basis for reconsidering these prior decisions, we will not address these issues here.

Defendant's final argument is an omnibus ineffective assistance of counsel claim. Defendant argues that any issue deemed waived must be considered on its merits because "defense counsel rendered ineffective assistance of counsel when they failed to do what was necessary to preserve these issues." This court considered a similar argument in *People v. Ramirez* (1983), 98 Ill. 2d 439. In *Ramirez* the court stated, "[D]efendant cannot make a general assertion of incompetence without even pointing out specific instances where issues were not preserved and expect this court to determine whether his contention is meritorious." (*Ramirez*, 98 Ill. 2d at 472.) As in that case, we will not consider such a general allegation.

## CONCLUSION

For the foregoing reasons we affirm defendant's convictions and sentence of death. We direct the clerk of this court to enter an order setting Wednesday, September 23, 1992, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. Defendant is to be executed in the manner provided by law (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court is to send a certified copy of this mandate to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Judgment affirmed.*